IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
Case 1:13-CV-23182 (Gayles/Turnoff)

-----------------------------------------------------------------x
FLO & EDDIE, INC., individually and on behalf of
all others similarly situated,

                              Plaintiff,

           -against-

SIRIUS XM RADIO INC., and DOES 1 through
10,

                          Defendants.
-----------------------------------------------------------------x

**DEFENDANT SIRIUS XM'S MOTION FOR SUMMARY JUDGMENT**
**ON LIABILITY AND SUPPORTING MEMORANDUM OF LAW**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................................1

FACTUAL BACKGROUND .......................................................................................................3

    A.    The Parties ............................................................................................................3

    B.    Plaintiff's Decades Of Acquiescence In The Unlicensed Public
          Performance Of Its Sound Recordings And The Limited Scope Of Its
          Licensing Activities ..............................................................................................3

ARGUMENT ...............................................................................................................................5

I.    FLORIDA LAW DOES NOT PROVIDE A RIGHT OF PUBLIC
     PERFORMANCE IN PRE-1972 RECORDINGS ............................................................5

    A.    Plaintiff's Claimed Entitlement To A Performance Right Is
          Undermined By The History And Evolution Of The Limited Federal
          And State Law Protections Afforded To Sound Recordings ....................................5

    B.    Florida Common Law Has Never Provided Copyright Owners With An
          Exclusive Right Of Public Performance ..................................................................8

    C.    It Would Be Inappropriate For The Court To Rewrite Florida Common
          Law To Prohibit Public Performances Of Sound Recordings Long
          Understood To Be Lawful .....................................................................................15

    D.    State Regulation Of Performances By A Nationwide Broadcaster Like
          Sirius XM Would Violate The Commerce Clause .................................................18

II.    PLAINTIFF'S "SECONDARY" CLAIMS BASED ON
     UNAUTHORIZED REPRODUCTION AND DISTRIBUTION FAIL
     BECAUSE SIRIUS XM HAS NEITHER MADE NOR DISTRIBUTED
     COPIES OF PLAINTIFF'S RECORDINGS IN FLORIDA .............................................20

CONCLUSION ...........................................................................................................................20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allergan, Inc. v. Athena Cosmetics, Inc.*,
    738 F.3d 1350 (Fed. Cir. 2013)...........................................................................................18

*Alphamed Pharm. Corp. v. Arriva Pharm., Inc.*,
    432 F. Supp. 2d 1319 (S.D. Fla. 2006), *aff'd*, 294 F. App'x 501 (11th Cir. 2008) .................11

*Am. Booksellers Found. v. Dean*,
    342 F.3d 96 (2d Cir. 2003)...................................................................................................18

*Am. Civil Liberties Union v. Johnson*,
    194 F.3d 1149 (10th Cir. 1999) ...........................................................................................18

*Arista Records, LLC v. Launch Media, Inc.*,
    578 F.3d 148 (2d Cir. 2009)...................................................................................................6

*Batlle v. Wachovia Bank, N.A.*,
    No. 10-21782-Civ, 2011 WL 1085579 (S.D. Fla. Mar. 21, 2011) .........................................14

*Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*,
    444 F.3d 1356 (Fed. Cir. 2006)...........................................................................................11

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*,
    476 U.S. 573 (1986)......................................................................................................18, 19

*CBS, Inc. v. Garrod*,
    622 F. Supp. 532 (M.D. Fla. 1985).....................................................................9, 10, 11, 13

*City of Philadelphia v. Lead Indus. Ass'n, Inc.*,
    994 F.2d 112 (3d Cir. 1993)................................................................................................15

*DeSilva Constr. Corp. v. Herrald*,
    213 F. Supp. 184 (M.D. Fla. 1962)........................................................................................9

*Donald Frederick Evans & Assocs., Inc. v. Cont'l Homes, Inc.*,
    785 F.2d 897 (11th Cir. 1986) ............................................................................................10

*Ediciones Musicales Y Representaciones Internacionales, S.A. v. San Martin*,
    582 F. Supp. 2d 1358 (S.D. Fla. 2008) ................................................................................10

*Feist Publ'ns v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991)......................................................................................................15, 16

*Gasparini v. Pordomingo*,
   972 So. 2d 1053 (Fla. Dist. Ct. App. 2008) ...............................................................14

*Gersh v. Cofman*,
   769 So. 2d 407 (Fla. Dist. Ct. App. 2000) ................................................................14

*Goldstein v. California*,
   412 U.S. 546 (1973)..........................................................................................15, 19, 20

*H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc.*,
   879 F.2d 1005 (2d Cir. 1989)...................................................................................15

*Halstead v. Grinnan*,
   152 U.S. 412 (1894)..................................................................................................8

*Harper & Row Publishers v. Nation Enters.*,
   471 U.S. 539 (1985)................................................................................................16

*Healy v. Beer Inst., Inc.*,
   491 U.S. 324 (1989)................................................................................................18

*Home Design Servs., Inc. v. Park Square Enters., Inc.*,
   No. 6:02-CV-637-ORL28JGG, 2005 WL 1027370 (M.D. Fla. May 2, 2005).......................11

*In re Aqua Clear Techs., Inc.*,
   361 B.R. 567 (Bankr. S.D. Fla. 2007) ......................................................................14

*In re Corbin's Estate*,
   391 So. 2d 731 (Fla. Dist. Ct. App. 1980) ..........................................................13, 14

*Int'l Tape Mfrs. Ass'n v. Gerstein*,
   344 F. Supp. 38 (S.D. Fla. 1972), *vacated on other grounds*, 494 F.2d 25 (5th Cir. 1974) ......9

*Kisling v. Rothschild*,
   388 So. 2d 1310 (Fla. Dist. Ct. App. 1980) ...............................................................9

*Lahtinen v. Liberty Int'l Financial Servs., Inc.*,
   No. 13-61766-CIV, 2014 WL 351999 (S.D. Fla. Jan. 31, 2014)...........................................13

*M.G.B. Homes, Inc. v. Ameron Homes, Inc.*,
   903 F.2d 1486 (11th Cir. 1990) ..............................................................................10

*Magical Mile, Inc. v. Benowitz*,
   510 F. Supp. 2d 1085 (S.D. Fla. 2007) ....................................................................10

*Manasa v. Univ. of Miami*,
   320 So. 2d 467 (Fla. Dist. Ct. App. 1975) (per curiam) ...............................................9

*Marine Transp. Servs. Sea-Barge Grp. v. Python High Performance Marine Corp.*,
    16 F.3d 1133 (11th Cir. 1994) ................................................................. 13

*NCAA v. Miller*,
    10 F.3d 633 (9th Cir. 1993) ....................................................................... 18

*NCAA v. Roberts*,
    TCA 94-40413-WS, 1994 WL 750585 (N.D. Fla. Nov. 8, 1994) ........................... 19

*Neva, Inc. v. Christian Duplications Int'l, Inc.*,
    743 F. Supp. 1533 (M.D. Fla. 1990) ........................................................... 9

*Pearson v. Wachovia Bank, N.A.*,
    No. 10-60612-CIV, 2011 WL 9505 (S.D. Fla. Jan. 3, 2011) .................................. 14

*Practice Mgmt. Assocs., Inc. v. Old Dominion Ins. Co.*,
    601 So. 2d 587 (Fla. Dist. Ct. App. 1992) (per curiam) ..................................... 11

*Santilli v. Cardone*,
    No. 8:07-CV-308-T-23MSS, 2008 WL 2790242 (M.D. Fla. July 18, 2008) ................. 13

*Senfeld v. Bank of Nova Scotia Trust Co. (Cayman) Ltd.*,
    450 So. 2d 1157 (Fla. Dist. Ct. App. 1984) ................................................. 13

*Shelby Mut. Ins. Co. of Shelby, Ohio v. Crain Press, Inc.*,
    481 So. 2d 501 (Fla. Dist. Ct. App. 1985) ................................................... 12

*Small Bus. Admin. v. Echevarria*,
    864 F. Supp. 1254 (S.D. Fla. 1994) ....................................................... 12, 13

*SmokEnders, Inc. v. Smoke No More, Inc.*,
    184 U.S.P.Q. 309 (S.D. Fla. 1974) ............................................................ 9

*Stagg Shop of Miami, Inc. v. Moss*,
    120 So. 2d 39 (Fla. Dist. Ct. App. 1960) ................................................... 10

*Star Fruit Co. v. Eagle Lake Growers*,
    33 So. 2d 858 (Fla. 1948) (en banc) ......................................................... 12

*Tambourine Comercio Internacional SA v. Solowsky*,
    312 F. App'x 263 (11th Cir. 2009) .......................................................... 14

*Tedder v. Florida*,
    75 So. 783 (Fla. 1917) ..................................................................... 14, 15

*Third Party Verification v. Signaturelink*,
    492 F. Supp. 2d 1314 (M.D. Fla. 2007) ...................................................... 11

*Tidler v. Eli Lilly & Co.*,
    851 F.2d 418 (D.C. Cir. 1988) ................................................................................15

*Van Dusen v. Se. First Nat'l Bank*,
    478 So. 2d 82 (Fla. Dist. Ct. App. 1985) ................................................................9

*Workplace Corp. v. Office Depot, Inc.*,
    No. 89-1485-CIV-T-13A, 1990 WL 106727 (M.D. Fla. June 5, 1990) ..................10

*Wyoming v. Oklahoma*,
    502 U.S. 437 (1992) ...............................................................................................19

**Statutes**

17 U.S.C. § 106 ...........................................................................................................6

17 U.S.C. § 110 .........................................................................................................17

17 U.S.C. § 114 .......................................................................................................6, 7

17 U.S.C. § 301 .........................................................................................................19

17 U.S.C. § 801 ...........................................................................................................7

17 U.S.C. § 802 ...........................................................................................................7

17 U.S.C. § 803 ...........................................................................................................7

17 U.S.C. § 804 ...........................................................................................................7

17 U.S.C. § 805 ...........................................................................................................7

Act of Feb. 3, 1831, ch. 16, § 1, 4 Stat. 436 ..............................................................6

Fla. Stat. § 772.11 .....................................................................................................14

Fla. Stat. § 812.014 ...................................................................................................14

Sound Recording Act of 1971, Pub. L. No. 92-140, 85 Stat. 391 (1971) ..................6

**Other Authorities**

117 Cong. Rec. 2002 (daily ed. Feb. 8, 1971) ............................................................6

Comments of Sound Exchange, Inc., *Music Licensing Study: Notice and Request for Public
    Comment*, Docket No. 2014-03 (May 23, 2014) ............................................17, 18

*Copyright Law Revision: Hearings Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the H. Comm. on the Judiciary on H.R. 2223* (Comm. Print 1975) ...................................................................................................19

H.R. Rep. No. 92-487 (1971)............................................................................................6

H.R. Rep. 104-274 (1995)......................................................................................6, 7, 17

S. Rep. No. 92-72 (1971) .................................................................................................6

S. Rep. No. 104-128 (1995) ............................................................................................17

U.S. Copyright Office, *Federal Copyright Protection for Pre-1972 Sound Recordings* 44-45 (2011) ..........................................................................................................7, 16, 17

## MOTION

Defendant Sirius XM Radio Inc. ("Sirius XM") hereby respectfully moves the Court to grant summary judgment on liability to Sirius XM and to dismiss the Amended Complaint of Plaintiff Flo & Eddie, Inc. with prejudice pursuant to Federal Rule of Civil Procedure 56.

## MEMORANDUM OF LAW

### INTRODUCTION

By this lawsuit, Plaintiff seeks to overturn decades of settled law and industry practice concerning public performances of sound recordings created prior to February 15, 1972 ("Pre-1972 Recordings").  Plaintiff asks the Court to invent an exclusive right of public performance for sound recordings under Florida law in the absence of any supporting precedent—indeed, in the face of the decades of acknowledgement by the recording industry, the U.S. Copyright Office, and Congress alike that no such right exists.  The result Plaintiff seeks would dramatically expand Florida law, unravel a century of contrary understandings between the music and broadcasting industries, and impermissibly regulate interstate commerce in violation of the Commerce Clause of the U.S. Constitution.

Plaintiff brings suit over some 100 recordings of songs by The Turtles made prior to 1972.  It concedes that none of these recordings is entitled to protection under federal copyright law, as the Copyright Act only affords protection to sound recordings made on or after February 15, 1972 ("Post-1972 Recordings").  Seeking to fill a deliberate legislative gap, Plaintiff asserts that Sirius XM's broadcasts of Pre-1972 Recordings infringe purported rights under Florida common law.  Plaintiff has no explanation for why, if these claimed state-law rights in Pre-1972 Recordings exist, Plaintiff waited more than four decades to assert them, and no explanation for why Plaintiff has asserted them against just one broadcaster out of many thousands of music users engaging in precisely the same conduct in Florida.  Plaintiff's facile reference to Sirius XM's ability to deliver music to subscribers digitally does not even begin to fill the legal vacuum in which Plaintiff's claims have been fashioned, let alone distinguish Sirius XM from its terrestrial radio competitors, which routinely broadcast in digital format.  None of them has ever sought—let alone received—a license from Plaintiff either.

To the limited extent that Florida common law has protected owners of Pre-1972 Recordings, it has afforded relief solely to combat record piracy, *i.e.*, commercial distribution of copies of sound recordings in competition with the owner's own sales.  The discovery record

1

demolishes Plaintiff's newly-minted effort to equate radio broadcasting to record piracy. Among many other reasons, Plaintiff's claims fail because there is no competitive threat akin to record piracy here: Plaintiff has conceded that Sirius XM does not compete with Plaintiff, and it cannot point to a single lost sale or license as a result of Sirius XM's activities. These admissions completely undermine the made-up allegations of competitive injury and marketplace impact that were first added in the Amended Complaint to avert a second motion to dismiss.

In contrast to the protection afforded against record pirates that make and sell copies of sound recordings in competition with the owner's own sales, Florida law has never provided a means for record companies to collect enormous sums of money from radio broadcasters or other music users arising out of performances of Pre-1972 Recordings. A contrary determination by this Court would immediately turn the thousands of radio broadcasters, webcasters, nightclubs, retail establishments, and the like that perform such recordings within Florida into serial copyright infringers. It would also impermissibly regulate interstate commerce. Sirius XM is a nationwide broadcaster. By federal law and technological necessity, its performances in one state are identical to its performances in every other. Sirius XM could not comply with regulation of its performances in Florida without being forced to comply with such regulation everywhere. The Commerce Clause bars this result.

By Plaintiff's own admission, claims arising out Sirius XM's broadcasts are the "gravamen of the Complaint," but Plaintiff has also asserted "secondary" claims based on the alleged distribution and copying of its recordings.[1] These tag-along claims are equally meritless. Plaintiff's claims based on purported distribution fail because Sirius XM has never distributed its recordings. The claims arising out of alleged copying fail because none of the server or other incidental copies of Plaintiff's recordings made by Sirius XM in aid of its lawful broadcasts have been made in Florida. They are thus beyond the territorial reach of Florida law. As Plaintiff has only asserted claims under Florida law in this action, they must be dismissed. In any event, Florida law does not entitle record companies to condition lawful performances of their works by entities that are not engaged in competing sales of sound recordings upon payment of a royalty arising out of acts of incidental copying necessary to enable such performances to be made in the

---

[1] Pl.'s Resp. to Def.'s Mot. To Transfer Venue at 11 & n.2, *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. 1:13-cv-23182 (DPG) (S.D. Fla. Oct. 28, 2013), ECF No. 23. ("Pl. Trans. Op.").

first place.  Allowing Plaintiff to extract payments for such copying would be tantamount to permitting the record industry to regulate those very performances.

For the foregoing reasons, as amplified herein, Sirius XM is entitled to summary judgment, and the Complaint should be dismissed with prejudice.

## FACTUAL BACKGROUND

### A.    The Parties

Plaintiff purports to own certain sound recordings of songs by The Turtles, each of which was created prior to February 15, 1972.  Mark Volman and Howard Kaylan are Plaintiff's sole owners, officers, directors, and employees.  Evan Cohen is its music administrator and lawyer. Sirius XM's Statement of Undisputed Material Facts ¶¶ 1-2 ("SXM 56.1").

Defendant Sirius XM is a satellite radio provider that operates a nationwide broadcast service.  Sirius XM is the result of the July 2008 merger between Sirius Satellite Radio Inc. ("Sirius") and XM Satellite Radio Inc. ("XM"), which each began operations more than 12 years ago.  Sirius XM has operated both services since that merger.  SXM 56.1 ¶¶ 3, 9.

Sirius XM broadcasts over 135 channels of music, sports, news, talk, and other entertainment content.  Sirius XM delivers its broadcasts via satellite radio and, with the assistance of certain third parties, by streaming over the Internet.  By federal law and technological necessity, Sirius XM's satellite radio broadcasts in Florida are identical to those transmitted to subscribers in every other state.  Sirius XM allows subscribers to save certain programs temporarily on mobile devices for later listening, but that content does not include any of Plaintiff's recordings (or any other unlicensed music).  SXM 56.1 ¶¶ 4-7, 23.

As a necessary incident to broadcasting and streaming recordings, Sirius XM makes a limited number of copies of those recordings.  These take the form of digital copies stored on the computer servers that house Sirius XM's library of recordings, certain copies "cached" temporarily on a "playout server" in the course of the broadcast transmission, and "tips and tails," *i.e.*, very short portions of the beginnings and ends of songs, for its producers to use when recording voiceovers to be inserted during the transitions between songs in a program.  None of these copies is ever accessible to the public.  Moreover, *none of these copies was made in Florida*.  SXM 56.1 ¶¶ 11-25.

### B.    Plaintiff's Decades Of Acquiescence In The Unlicensed Public Performance Of Its Sound Recordings And The Limited Scope Of Its Licensing Activities

The activities at issue here are neither covert nor newly undertaken.  Plaintiff has been

aware of the Sirius and XM services for at least ten years and has long known that Sirius XM was playing certain of its Pre-1972 Recordings.  Prior to filing this lawsuit and virtually identical actions in California and New York,[2] Plaintiff never communicated to Sirius XM that it believed Sirius XM was infringing its rights nor sought compensation of any kind.  The sole stated rationale for this lawsuit is that Sirius XM has not paid royalties to Plaintiff for performances of its recordings, and Plaintiff wanted to "raise awareness" of that.  SXM 56.1 ¶¶ 27-30.

The same Turtles' recordings at issue in this lawsuit have been played on radio stations since those songs were recorded more than 42 years ago, and on Internet radio since the 1990s. Retail stores, bars, restaurants, and many other physical establishments publicly perform sound recordings, including those by the Turtles.  Plaintiff has never licensed, tried to license, or sued any of the radio stations or other entities that publicly perform (as well as make server or other incidental copies of) Plaintiff's recordings without a license.  SXM 56.1 ¶¶ 33-43.

Plaintiff licenses certain digital uses of its recordings through The Orchard ("Orchard"), a distributor of music content that aggregates the rights to recordings from tens of thousands of independent labels, and then licenses those recordings, on a catalog-wide basis, to music users around the world. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████ Although broadcast radio stations commonly perform Pre-1972 Recordings, Orchard has never licensed one.  SXM 56.1 ¶ 34 (Pascal Tr. 44:5-45:21) ("They don't distribute our music.  They may play our music, but [] they aren't required by law to pay us for it, so we've not sought to license them in any way.").  No music provider has ever refused to take a license from Plaintiff or Orchard, or sought a lower royalty rate, because Sirius XM plays Pre-1972 Recordings without a license. Sirius XM has never even come up in such discussions.  SXM 56.1 ¶ 29.

---

[2] *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. BC 517032 (Cal. Super. Ct. L.A. Cnty.) (filed Aug. 1, 2013) (subsequently removed to federal court); *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. 13-CV-5784 (CM) (S.D.N.Y.) (filed Aug. 15, 2013).  While Plaintiff is located in California, and Sirius XM is headquartered in New York, there is no particular nexus to Florida.

**ARGUMENT**

To the extent that Plaintiff's claims are based on performances of its Pre-1972 Recordings, those claims fail as a matter of law. Florida law does not provide a right of public performance, nor could it, as state law regulation of performances by nationwide broadcasters such as Sirius XM would impermissibly regulate interstate commerce. *See* Point I. To the extent that Plaintiff's claims are based on alleged distribution of copies of Plaintiff's recordings to subscribers, they fail for lack of proof, and to the extent they are based on incidental copies made by Sirius XM in aid of public performance, they fail because such copying does not take place in Florida and is outside the territorial reach of Florida law. *See* Point II.[3]

**I.    FLORIDA LAW DOES NOT PROVIDE A RIGHT OF PUBLIC PERFORMANCE IN PRE-1972 RECORDINGS**

Plaintiff claims infringements of 100 of its Pre-1972 Recordings. *See* Am. Compl., ¶¶ 9-11, 17-18, 39. 85 of these recordings have never even been broadcast by Sirius XM. SXM 56.1 ¶¶ 10. Plaintiff's claims as to the remaining 15 fail because Florida law does not provide an exclusive right of public performance in Pre-1972 Recordings.

**A.    Plaintiff's Claimed Entitlement To A Performance Right Is Undermined By The History And Evolution Of The Limited Federal And State Law Protections Afforded To Sound Recordings**

Across many decades, record industry advocates, broadcasters, the U.S. Copyright Office, and Congress have uniformly recognized that: (i) state law protections for sound recordings (including, though not limited to, Florida) *do not* extend to public performances thereof; (ii) Congress considered, but up until 1995 rejected, record industry overtures to augment federal copyright law to provide first-time recognition of such a performance right; and (iii) Congress's limited recognition of such a right beginning in 1996 pertained solely to Post-1972 Recordings. We briefly review the historical record of the protections for sound recordings to demonstrate both the novelty and implausibility of Plaintiff's contention that Sirius XM's broadcast activities in relation to Plaintiff's Pre-1972 Recordings violate Florida law. No part of that historic record remotely supports Plaintiff's legal position.

Since at least 1831, musical compositions, as distinct from the sound recordings in which

---

[3] Such incidental copying is lawful where it occurs. Sirius XM has a pending motion for summary judgment in the virtually identical action that Plaintiff filed in New York, where Sirius XM is based.

those compositions are sometimes embodied, have been protected by federal copyright laws.  *See* Act of Feb. 3, 1831, ch. 16, § 1, 4 Stat. 436, Declaration of Edward Soto, dated July 15, 2014 ("Soto Decl."), Ex. 12.  It was not until enactment of the Sound Recording Act of 1971, Pub. L. No. 92-140, 85 Stat. 391 (1971) ("Sound Recording Act"), that sound recordings began to receive any protection at all under federal law.  The Sound Recording Act was expressly intended to address record piracy, which had "rapid[ly] increase[d]" in preceding years due to technological advances and inconsistent state law protection.  117 Cong. Rec. 2002 (daily ed. Feb. 8, 1971) (statement of Sen. John McClellan), Soto Decl. Ex. 13; *see also Arista Records, LLC v. Launch Media, Inc.*, 578 F.3d 148, 152 (2d Cir. 2009); H.R. Rep. No. 92-487, at 2 (1971), Soto Decl. Ex. 14; S. Rep. No. 92-72, at 1, 7 (1971), Soto Decl. Ex. 15.  In furtherance of this goal, owners of qualifying recordings—*i.e.*, Post-1972 Recordings—were granted carefully circumscribed prospective rights that were designed to combat record piracy, specifically the rights "[t]o reproduce and distribute" "tangible" copies of sound recordings.  Sound Recording Act §§ 1, 3, Soto Decl. Ex. 16; 17 U.S.C. § 106(1), (3).

The debate over the scope of federal copyright rights to be accorded sound recordings centrally included the issue whether, in addition to exclusive rights to reproduce and distribute such works, Congress should also provide a right of public performance akin to that conferred by federal law upon owners of musical works (*see* 17 U.S.C. § 106(4)).  Congress determined otherwise, viewing the addition of a performance right as an unnecessary augmentation of the rights needed to accomplish the goal of the legislation.  *See* Sound Recording Act §§ 1(a), 3, Soto Decl. Ex. 16; 17 U.S.C. § 114(a) (stating that sound recording rights "do not include any right of performance under section 106(4)" of the Copyright Act); H.R. Rep. No. 104-274, at 11 (1995) (recordings "were not granted the rights of public performance, on the presumption that the granted rights would suffice to protect against record piracy"), Soto Decl. Ex. 17; H.R. Rep. No. 92-487, at 14, Soto Decl. Ex. 14.  The record of that debate is extensive and uniform in reflecting the common understanding among all interested parties that existing state laws did *not* extend to such performances; to the contrary, the record industry advocated unsuccessfully for such federal protection precisely to remedy this perceived inequity, much as radio broadcasters successfully opposed such a new legal and economic constraint on their businesses.  *See* Soto

6

Decl. Exs. 18, 19.[4]

The issue was revisited in connection with what became, in 1995, the Digital
Performance Rights in Sound Recordings Act.  Congress there responded affirmatively—to a
point—to the record industry's persistent drive for recognition of a sound recording performance
right, adding a limited such right, confined to digital audio transmissions of *Post-1972*
Recordings, that was further circumscribed to ensure that it would not impede the development
of new technologies for increasing public access to performances of sound recordings.  These
limitations included a compulsory statutory license designed to ensure that various categories of
services delineated by the statute, including satellite radio, would be assured uninterrupted access
to the sound recordings involved and that such access would be provided at a reasonable price.
An elaborate agency rate-setting process was established as a part of this framework; the
responsible agency, now the Copyright Royalty Board, has regulated the post-1972 recording
performance royalties payable by Sirius XM and others ever since.  *See* H.R. Rep. 104-274, at
22, Soto Decl. Ex. 17; 17 U.S.C. §§ 114(d), 114(f), 801-805.  Once again, Congress determined
not to grant a performance right of any kind in Pre-1972 Recordings.

The record surrounding federal creation of this circumscribed sound recording
performance right applicable to Post-1972 Recordings confirms the uniform understanding by all
constituent interests that state laws did not afford sound recording owners public performance
rights in their works.  The leading record industry trade association, the Recording Industry
Association of America, summarized it well in testifying:  "Under existing law, record
companies and performers . . . have *no rights* to authorize or be compensated for the broadcast or
other public performance of their works."  *See* Soto Decl. Ex. 20.  The testimony of the National
Association of Broadcasters and others was in line.  *See* Soto Decl. Exs. 21-22.  The U.S.
Copyright Office, both in contemporaneous submissions concerning such federal legislation and
since, has shared that understanding.  *See* Soto Decl. Exs. 23-26; U.S. Copyright Office, *Federal
Copyright Protection for Pre-1972 Sound Recordings* 44-45 (2011), Soto Decl. Ex. 27.

---

[4] In order to accept Plaintiff's position that Florida (and New York and California) law provides
an exclusive right of public performance, the Court would need to believe that Congress, by
preempting state laws with respect to Post-1972 Recordings and determining not to create a
federal performance right for such recordings, dramatically *narrowed* the rights afforded to
sound recording owners at the time under state law.  This is absurd.  Not a single legislative
advocate ever so argued.  Quite to the contrary, Congress clearly understood that it was leaving
public performances of sound recordings unregulated *at either the state or federal level*.

Against this legislative backdrop, it is nothing short of disingenuous for Plaintiff to argue that Florida recognizes a right that its own industry trade association, among other knowledgeable constituents, has repeatedly acknowledged does not exist.

**B.      Florida Common Law Has Never Provided Copyright Owners With An Exclusive Right Of Public Performance**

No court applying Florida law has recognized a right of public performance in sound recordings, whether pre- or post-1972.  The complete absence of supporting precedent for Plaintiff's claims not only undermines its case, it also explains Plaintiff's silence as to its— indeed, the entire record industry's—record of inaction over many decades in enforcing a supposed Florida public performance right in Pre-1972 Recordings in relation to the countless millions of performances of such works by a multitude of Florida entities.  Why else would assumedly economically rational artists and record companies have failed to seek royalties from generations of radio broadcasters, bars, restaurants and myriad other users making performances of their Pre-1972 Recordings?[5]  The absence of such efforts simply reinforces that there is no such right.  As the U.S. Supreme Court has aptly observed: "So strong is the desire of every man to have the full enjoyment of all that is his, when a party comes into court and asserts that he has been for many years the owner of certain rights, of whose existence he has had full knowledge, and yet has never attempted to enforce them, there is a strong persuasion that, if all the facts were known it would be found his alleged rights either never existed or had long since ceased." *Halstead v. Grinnan*, 152 U.S. 412, 416 (1894).

Plaintiff's effort to locate a performance right within various Florida state law doctrines fails as a matter of law.  Each claim suffers from multiple defects that require summary judgment for Sirius XM.

*1.      First Claim for Relief: Common Law Copyright Infringement*

Plaintiff's claim for common law copyright infringement fails for at least two reasons.  First, each of the sound recordings was published more than four decades ago, and Plaintiff lost

---

[5] By comparison, the American Society of Composers, Authors & Publishers ("ASCAP"), an organization that licenses performing rights in *musical compositions* contained within sound recordings, has licenses in place with more than 8000 Florida entities, including more than 500 radio stations, more than 4400 bars and restaurants, and nearly 900 retailers.  SXM 56.1 ¶ 44. The notion that Plaintiff and other labels possess an equivalent performance right but have never bothered to pursue comparable licensing lacks credibility.

whatever common law copyrights it owned under Florida law upon publication.  *See, e.g.*, *Kisling v. Rothschild*, 388 So. 2d 1310, 1312 (Fla. Dist. Ct. App. 1980) ("The umbrella of protection afforded by a common law copyright folds up and vanishes when the owner of the product 'publishes' it, or in some manner dedicates it to the public."); *Manasa v. Univ. of Miami*, 320 So. 2d 467, 468 (Fla. Dist. Ct. App. 1975) (per curiam) (affirming dismissal of common law copyright infringement claim because work at issue was published, and "therefore, not subject to common law copyright").  Florida applies this principle applies to sound recordings like any other form of work otherwise capable of common law copyright protection.  *See Neva, Inc. v. Christian Duplications Int'l, Inc.*, 743 F. Supp. 1533, 1544 (M.D. Fla. 1990); *see also Int'l Tape Mfrs. Ass'n v. Gerstein*, 344 F. Supp. 38, 57 (S.D. Fla. 1972), *vacated on other grounds*, 494 F.2d 25 (5th Cir. 1974).[6]

Second, even for unpublished works, the scope of protection afforded to common law copyrights is limited to acts of reproduction and commercial distribution that usurp the right of first publication.  It does not extend to public performance.  *See SmokEnders, Inc. v. Smoke No More, Inc.*, 184 U.S.P.Q. 309, 318 (S.D. Fla. 1974) (noting need to prove "actual copying" in case involving unpublished teaching manuals); *Van Dusen v. Se. First Nat'l Bank*, 478 So. 2d 82, 87-88 (Fla. Dist. Ct. App. 1985) (actions that do not usurp right of first publication "did not give rise to a cause of action for infringement of common law copyright"); *see also Int'l Tape Mfrs. Ass'n*, 344 F. Supp. at 57 (noting limited nature of common law copyright); *DeSilva Constr. Corp. v. Herrald*, 213 F. Supp. 184, 198 (M.D. Fla. 1962).  Notwithstanding the countless millions of performances of Pre-1972 Recordings in Florida by a multitude of music users over the past century, there is no case finding such performances to constitute common law copyright infringement under Florida law.

### 2. *Second Claim for Relief: Unfair Competition*

To prove a claim for unfair competition, "Florida law requires that [plaintiff] establish deceptive or fraudulent conduct of a competitor and likelihood of consumer confusion."  *See*

---

[6] In *CBS, Inc. v. Garrod*, 622 F. Supp. 532 (M.D. Fla. 1985), a case involving record piracy, the court concluded (without citing any Florida precedent) that publication of CBS's sound recordings did not divest CBS of common law copyrights, although the case involved unfair competition and conversion claims, rather than a copyright infringement claim. In any event, radio broadcasting is not record piracy and, as shown in Points I.B.2-3 below, Plaintiff's claims for unfair competition and conversion are woefully deficient.

*M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1493 (11th Cir. 1990) (citing *Donald Frederick Evans & Assocs., Inc. v. Cont'l Homes, Inc.*, 785 F.2d 897, 914 (11th Cir. 1986)); *Magical Mile, Inc. v. Benowitz*, 510 F. Supp. 2d 1085, 1089-90 (S.D. Fla. 2007) (citing *Stagg Shop of Miami, Inc. v. Moss*, 120 So. 2d 39 (Fla. Dist. Ct. App. 1960)). Plaintiff, however, cannot meet either requirement. Plaintiff's sole allegation concerning deceptive conduct or a likelihood of consumer confusion is the conclusory assertion that Sirius XM's "unauthorized use of the Pre-1972 Recordings is likely to cause confusion, mistake or deception as to the source, sponsorship, affiliation or connection between Plaintiff and the other Class Members, and Defendants." Am. Compl. ¶ 48. The undisputed record evidence demolishes this assertion. Plaintiff cannot identify any deceptive conduct by Sirius XM and admits that there is no evidence of actual confusion. SXM 56.1 ¶ 47. Kaylan acknowledged that he has never thought that any of the artists whose recordings are performed on Sirius XM's service are somehow sponsoring Sirius XM. SXM 56.1 ¶ 48. There is no reason to believe that Sirius XM's broadcasts will suddenly start causing confusion as to any affiliation with Plaintiff now.

Because it cannot meet the elements of Florida's unfair competition tort, Plaintiff attempts to rely on a unique, non-binding test that is specific to the record piracy context and contends that it must prove only "(A) time, labor and money expended by the Plaintiff; (B) competition; and (C) commercial damage." Am. Compl. ¶ 1 (citing *CBS*, 622 F. Supp. 532). This test was fashioned specifically to address sale of bootlegged records, *see CBS*, 622 F. Supp. at 536, and it is applicable only to that narrow, inapposite factual circumstance. *See Ediciones Musicales Y Representaciones Internacionales, S.A. v. San Martin*, 582 F. Supp. 2d 1358, 1361 (S.D. Fla. 2008) ("[I]n *CBS*, the court limited the availability of these elements to state a cause of action for unfair competition to those cases involving record piracy."); *Workplace Corp. v. Office Depot, Inc.*, No. 89-1485-CIV-T-13A, 1990 WL 106727, at *1 & n.2 (M.D. Fla. June 5, 1990) ("As specifically stated in *CBS*, [the court's] list of requisite elements extends only to *cases involving record piracy*." (emphasis in original)). It does not apply to public performances, which explains why no one has ever successfully sued a radio broadcaster or other music user that performs Pre-1972 Recordings in Florida on an unfair competition claim, either before *CBS* or in the 30 years since.

Even if the Court were to utilize the inapposite test Plaintiff cites, Plaintiff's attempt to locate a performance right within Florida's unfair competition tort would still fail. Assuming

10

*arguendo* that Plaintiff could establish the first of the three *CBS* elements, Plaintiff cannot show either the requisite competition with Sirius XM or any commercial damage that flows from broadcasts of its songs.  Indeed, Plaintiff has admitted that it does not compete with Sirius XM. SXM 56.1 ¶ 46 (Kaylan Tr. 94:2-4 ("I don't know how we would be considered a competitor with a satellite provider.  We don't do that.")).  Plaintiff's reliance on the misguided notion that Sirius XM's performances of its works are somehow unfair in some more general sense is insufficient as a matter of law.  As the Florida appellate court has recognized:

> The phrase "unfair competition" . . . refers unambiguously only to actions affecting competitors. This is consistent with the Florida case law that requires injury to a competitor as an essential element of any claim of unfair competition. Even giving the phrase "unfair competition" its broadest ordinary meaning, the offense must include at least two elements, "unfairness" and "competition." This requirement that the offense include an element of rivalry is consistent with the plain meaning of the words and with recognized definitions. To define "unfair competition" simply to mean any act of a commercial enterprise which is unfair would be to expand the phrase to include all alleged wrongdoing by business and therefore include all manner of breach of contract, torts and violations of statutes, administrative regulations and the like. Such a boundless definition is therefore unreasonable.

*Practice Mgmt. Assocs., Inc. v. Old Dominion Ins. Co.*, 601 So. 2d 587, 587-88 (Fla. Dist. Ct. App. 1992) (per curiam).  *Accord Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*, 444 F.3d 1356, 1362 (Fed. Cir. 2006); *Third Party Verification v. Signaturelink,* 492 F. Supp. 2d 1314, 1325 (M.D. Fla. 2007); *Home Design Servs., Inc. v. Park Square Enters., Inc.*, No. 6:02-CV-637-ORL28JGG, 2005 WL 1027370, at *14 (M.D. Fla. May 2, 2005).

There is also no evidence of "commercial damage."  In *CBS*, the "commercial damage" was the plaintiff's failure to make a sale it would have made but for the record piracy.  622 F. Supp. at 536.  There is no equivalent damage here because Plaintiff cannot point to any lost sales caused by radio broadcasts, whether by Sirius XM or anyone else.[7]  Kaylan conceded that he did

---

[7] As Plaintiff's Opposition to Sirius XM's Motion to Compel Interrogatory Responses and the report proffered by its proposed expert witness on damages make plain, Plaintiff's theory of damages in this case is limited solely to the fact that Sirius XM (no differently than thousands of other entities) has earned revenues from performing Pre-1972 Recordings without paying royalties.  Pl.'s Resp. to Mot. to Compel Further Resps. to Interrogs. at 4, *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. 1:13-cv-23182 (DPG) (S.D. Fla. July 7, 2014), ECF No. 75; Soto Decl. Ex. 31.  That Sirius XM has earned revenues is not cognizable "commercial damage" to Plaintiff.  *Cf. Alphamed Pharm. Corp. v. Arriva Pharm., Inc.*, 432 F. Supp. 2d 1319, 1344-55 (S.D. Fla. 2006), *aff'd*, 294 F. App'x 501 (11th Cir. 2008).

not know how Sirius XM performing the Turtles' recordings "would cause anything one way or another to lose or gain" and admitted "I don't understand how it would affect sales particularly." SXM 56.1 ¶ 45.  When asked about terrestrial radio play, Kaylan similarly indicated that he doubted that "because radio plays our records, we lose sales."  SXM 56.1 ¶ 37.  Volman, for his part, admitted that he could not identify a single lost sale caused by Sirius XM's activities and indicated that he was not aware of any evidence that Sirius XM has impaired Flo & Eddie's ability to sell or license its Turtles' recordings.  SXM 56.1 ¶ 45.   Cohen and Orchard's Jason Pascal—the two representatives that conduct all licensing activities on behalf of Plaintiff— likewise admitted that they could not point to any specific license fees or sales that Plaintiff had lost on account of the activities of Sirius XM.  SXM 56.1 ¶ 45.  Sirius XM has never even come up in any licensing discussion.  SXM 56.1 ¶ 29.

### 3.    Third Claim for Relief: Conversion

Plaintiff's conversion claim also fails.  Under Florida law, "conversion is an unauthorized act which deprives another of his property permanently or for an indefinite time."  *Small Bus. Admin. v. Echevarria*, 864 F. Supp. 1254, 1262 (S.D. Fla. 1994); *see Shelby Mut. Ins. Co. of Shelby, Ohio v. Crain Press, Inc.*, 481 So. 2d 501, 503 (Fla. Dist. Ct. App. 1985).

As the Florida Supreme Court explained nearly 60 years ago, dispossession or deprivation of the property is essential to the tort:

> [The] [e]ssential element of a conversion is a wrongful deprivation of property to the owner.  The gist of a conversion has been declared to be not the acquisition of the property of the wrongdoer, but the wrongful deprivation of a person of property to the possession of which he is entitled.  A conversion consists of an act in derogation of the plaintiff's possessory rights, and any wrongful exercise or assumption of authority over another's goods, depriving him of the possession, permanently or for an indefinite time. . .

*Star Fruit Co. v. Eagle Lake Growers*, 33 So. 2d 858, 860 (Fla. 1948) (en banc) (quotations omitted); *see also id.* (describing conversion as "detaining goods so as to deprive the person entitled to the possession of them his dominion over them" and "exercise of dominion to the exclusion and in defiance of the plaintiff's right" (quotation omitted)).  Moreover, to state a claim for conversion, a plaintiff must show not just deprivation of possession, but that the defendant *intended* to deprive the plaintiff:

> The Court has examined the cases addressing this issue and concludes that if the Supreme Court chose to revisit the issue, it would not disturb its prior rulings holding that intent is a necessary element of conversion. Specifically, the Court

follows the Third District Court of Appeals decision in *Senfeld*, which found that "the essence of conversion is not the possession of property by the wrongdoer but rather such possession in conjunction with a present intent … to deprive the person entitled to possession of the property."

*Echevarria*, 864 F. Supp. at 1262-63 (quoting *Senfeld v. Bank of Nova Scotia Trust Co. (Cayman) Ltd.*, 450 So. 2d 1157, 1161 (Fla. Dist. Ct. App. 1984)); *see Lahtinen v. Liberty Int'l Financial Servs., Inc.*,  No. 13-61766-CIV, 2014 WL 351999, at *5 (S.D. Fla. Jan. 31, 2014) ("[A] plaintiff must prove intent in order to succeed on conversion.").

In other words, conversion does not arise merely where a defendant benefits by the use of property without paying for it, but only where that use deprives the property owner of its possession.  *See Marine Transp. Servs. Sea-Barge Grp. v. Python High Performance Marine Corp.*, 16 F.3d 1133, 1140 (11th Cir. 1994) (explaining that "the essence of the tort is not the acquisition of the property; rather, it is the wrongful deprivation" (quotation omitted)); *see also Santilli v. Cardone*, No. 8:07-CV-308-T-23MSS, 2008 WL 2790242, at *5 (M.D. Fla. July 18, 2008) ("Copyright infringement will not form the basis of a conversion claim because copying a plaintiff's work … fails to deprive the plaintiff of his property.").

Plaintiff's conversion claim fails because there was no dispossession or deprivation (let alone intent to dispossess).  Plaintiff did not even attempt to allege that there was.  There was no demand for return, nothing to surrender, and no interference with any sale or licensing opportunity of any kind.  SXM 56.1 ¶¶ 29, 37, 45.  Not surprisingly, no Florida court has ever held the unlicensed public performance of a sound recording to constitute conversion.

Again, *CBS* is not to the contrary.  As noted, the case involved record piracy—a defendant whose sale of bootleg records interfered with and deprived the plaintiff of the opportunity to sell its own copies to the same pool of customers.  While *CBS* represents an extension of the traditional conversion tort from tangible items to "intangible interests in a business venture," *see* Am. Compl. ¶1, the logic of the decision puts it squarely in line with the requirements outlined above, namely, that the defendant be deprived of its property as a result of the defendant's actions (in that case, the established business opportunity and sales revenue the plaintiff otherwise would have earned and "possessed" itself).[8]  That logic does not extend to

---

[8] This interpretation is confirmed by the cases on which *CBS* relies.  *In re Corbin's Estate*, for example, involved a defendant who sold a deceased's entire business to a third party in a way that deprived the heirs of possession of the business and its income stream and profits.  391 So.

performances that do not interfere with any of Plaintiff's existing business activities, and the record confirms that there has been no such interference of any kind.  SXM 56.1 ¶¶ 29, 37, 45.

     *4.    Fourth Claim for Relief: Civil Theft*

     Plaintiff's final claim for relief is the truly frivolous assertion that Sirius XM's use of its Pre-1972 Recordings constitutes civil theft pursuant to Fla. Stat. § 772.11, which provides a civil cause of action for violations of the state's criminal theft statute, Fla. Stat. § 812.014.  Civil theft, as construed by Florida courts, requires a plaintiff to prove that "a conversion has taken place and that the accused acted with criminal intent."  *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1056 (Fla. Dist. Ct. App. 2008); *see also Batlle v. Wachovia Bank, N.A.*, No. 10-21782-Civ, 2011 WL 1085579, at *3 (S.D. Fla. Mar. 21, 2011); *Pearson v. Wachovia Bank, N.A.*, No. 10-60612-CIV, 2011 WL 9505, at *6 (S.D. Fla. Jan. 3, 2011).  Because Plaintiff has failed, for all the reasons detailed in Section I.B.3., *supra*, to state a claim for conversion based on the alleged performances of its Pre-1972 Recordings, its civil theft claim necessarily fails as well with respect to those activities.  *See Gasparini*, 972 So. 2d at 1056 ("Since we have found that there was no factual basis to support a claim for conversion, it stands to reason therefore, that there can be no cause of action for civil theft."); *Batlle*, 2011 WL 1085579, at *3 (same); *Pearson*, 2011 WL 9505, at *6 (same).

     Plaintiff's civil theft claim fails in any event because Plaintiff did not even allege, nor could it possibly prove, that Sirius XM acted with criminal intent.  *See Gasparini*, 972 So. 2d at 1056 (equating "felonious intent" with criminal intent for purposes of § 772.11); *Gersh v. Cofman*, 769 So. 2d 407, 409 (Fla. Dist. Ct. App. 2000) (same).  In the theft setting, such criminal intent typically is demonstrated by evidence that the taking was somehow fraudulent, deceptive, or kept secret by the defendant.  *See, e.g.*, *Tambourine Comercio Internacional SA v. Solowsky*, 312 F. App'x 263, 278-79 (11th Cir. 2009).  By comparison, "where the taking is open, and there is no subsequent attempt to conceal the property, and no denial, but an avowal of

---

2d 731, 731-32 (Fla. Dist. Ct. App. 1980).  Similarly, *In re Aqua Clear Techs., Inc.* involved the taking of a business phone number whereby calls to the number would be diverted to the defendant rather than to the estate of the original "owner" of the phone number.  361 B.R. 567, 574-75 (Bankr. S.D. Fla. 2007).  Unlike these situations, where the "business interest" could be possessed by one, and only one, person at a time, Sirius XM's performance of the Plaintiff's recordings does not dispossess or deprive Plaintiff of anything.

the taking, a strong presumption arises that there was no felonious intent . . . ." *Tedder v. Florida*, 75 So. 783, 783 (Fla. 1917) (internal quotation marks and citations omitted).

No differently than the broadcast radio industry generally, Sirius XM has used Plaintiff's recordings openly and with Plaintiff's knowledge for years. Plaintiff never demanded that Sirius XM stop doing so; instead, it remained completely silent for over a decade in the face of Sirius XM's public performance of its works "every hour of every day." Am. Compl. ¶ 2; *see* SXM 56.1 ¶ 28-29. Under these circumstances—and given the lack of a single case in Florida jurisprudence suggesting the existence of a performance right in Pre-1972 Recordings that Sirius XM might be violating—Plaintiff's allegation of criminal intent is nothing short of outrageous.

### C. It Would Be Inappropriate For The Court To Rewrite Florida Common Law To Prohibit Public Performances Of Sound Recordings Long Understood To Be Lawful

The responsibility of a federal court in a diversity case is to apply the law of the state in which the court sits, not to modify that law. *See, e.g.*, *Tidler v. Eli Lilly & Co.*, 851 F.2d 418, 424 (D.C. Cir. 1988) ("We must apply the law of the forum as we infer it presently to be, not as it might come to be." (citation omitted)); *City of Philadelphia v. Lead Indus. Ass'n, Inc.*, 994 F.2d 112, 123 (3d Cir. 1993) ("Our role is to apply the current law of the appropriate jurisdiction, and leave it undisturbed."); *see also H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1025 (2d Cir. 1989) (refusing to expand state unfair competition law to encompass "free riding" by a defendant that did not compete with the plaintiff because "it is not the role of a federal court . . . to undertake such an expansion of New York law"). This principle alone requires denial of the relief sought by Plaintiff here.

There is, in any event, no reason to believe that the Florida Supreme Court would expand state common law to encompass an exclusive right of public performance in Pre-1972 Recordings, and there are many reasons to believe that it would not. First, the creation and retroactive application of a performance right under Florida common law for Pre-1972 Recordings would do little to achieve the central purpose of copyright: to provide incentives for the creation of *new* works for dissemination to the public. *See Feist Publ'ns v. Rural Tel Serv. Co.*, 499 U.S. 340, 349 (1991) ("The primary objective of copyright is not to reward the labor of authors, but 'to promote the Progress of Science and useful Arts.'") (quoting U.S. Const. art. I, § 8, cl. 8); *Goldstein v. California*, 412 U.S. 546, 559 (1973) ("the very objective of the grant of protection" is "to induce new artistic creations"). The legal protections against unauthorized

15

reproduction available to creators of sound recordings prior to 1972, which did not include a performance right, provided ample legal incentive for the creation and dissemination of those recordings.[9]  As Plaintiff, by definition, cannot make any new Pre-1972 Recordings now (and new recordings are incentivized by federal copyright protection), the proposed new right would not provide incentives to creative activity.  Rather than expand the number of overall works available to the public, the creation of a new performance right would *reduce* the availability of Pre-1972 Recordings.  At a minimum, the proposed right would impose new and unanticipated fees on Sirius XM and other users if they wish to continue to perform Pre-1972 Recordings; that, in turn, would likely lead users either to raise the fees that they charge to consumers and/or to decrease their use of Pre-1972 Recordings in response.  Either way, public access almost assuredly would decline, with a conceded adverse impact on Plaintiff's ability to sell its recordings. SXM 56.1 ¶ 49 (Kaylan Tr. 71:7-22 (acknowledging promotional impact of radio play)).  For many Pre-1972 Recordings, licenses may not be available at any price, due to lack of information about who owns them.  *See* U.S. Copyright Office, *Federal Copyright Protection for Pre-1972 Sound Recordings* 76 & n.303, Soto Decl. Ex. 27.  Because the new exclusive right of performance urged by Plaintiff would produce a pure windfall to recording owners without *any* commensurate benefit to the public, there is no reason to recognize it.  *See Feist*, 499 U.S. at 349-50; *Harper & Row Publishers v. Nation Enters.*, 471 U.S. 539, 546 (1985) ("The monopoly created by copyright . . . rewards the individual author in order to benefit the public.").

Second, the creation of a new performance right for Pre-1972 Recordings would impose unfair burdens upon stockholders of Sirius XM and other businesses that were built in good-faith reliance upon the extant legal regime.  Those investors took huge risks.  *See* Declaration of David J. Frear, dated July 15, 2014 ("Frear Decl.") ¶¶ 4-7.  To impose new burdens with retroactive application on these enterprises surely would be unfair.

---

[9] Plaintiff, by its own admission, has already earned millions of dollars from the sale and distribution of copies of its recordings.  Am. Compl. ¶ 45.  More generally, the broad new right that Plaintiff asks this Court to create would apply retroactively to works that were made—at minimum—42 years ago and that would include recordings made as far back as 90 years ago.  These recordings (depending on the release date and popularity) could have been sold first on 78s; then on LPs; then on cassette tape; then on CDs; and then as digital downloads—thus providing their creators many successive revenue streams.  In all events, each such recording was created at a time when there was absolutely no expectation of a performance right.

16

Third, the creation of the proposed right would also threaten the careful balance of federal and state laws that currently governs the use of sound recordings.  Putting to one side the constitutional problem addressed in Point I.D below, having states adopt differently configured regimes would enable one state to encroach upon the legitimate interests of other states and would create intractable problems for companies such as Sirius XM that operate a uniform national service.  Of equal concern, the proposed right would frustrate a key goal of the compulsory licensing regimes created by Congress in 1995 and 1998 to govern digital audio transmissions of Post-1972 Recordings by satellite broadcasters (including Sirius XM) and webcasters: to preserve incentives for innovative services such as satellite radio to make sound recordings publicly available by depriving the record industry of the right to withhold access to its works and/or charge exorbitant royalties as a condition of their use.  *See* H.R. Rep. No. 104-274, at 12-14, Soto Decl. Ex. 17; S. Rep. No. 104-128, at 14-15 (1995), Soto Decl. Ex. 28.

The relief sought by Plaintiff would run roughshod over this Congressional solicitude for public access to sound recordings, creating as it would an unqualified state common law right, without compulsory licensing, that would require users to negotiate license fees directly for each Pre-1972 Recording.  The resultant combination of transaction costs and license fees would harm both users and consumers who would be denied access to performances of some works and bear the increased costs associated with performances of others.  On the other hand, an attempt to formulate a structure for a Florida performance right that mimics the federal framework would be a daunting challenge.[10]  Even SoundExchange, the record industry's agent for collecting royalties under the statutory license for federally copyrighted recordings, concurs.  It has observed that the state-law remedy sought by Plaintiff "will not lead to a sensible licensing regime" and that state-law regimes "do not provide the simplicity and efficiency that Congress

---

[10] For example, if the state right were tempered by a compulsory license, who would design and administer the rate-making procedures?  How would courts deal with uses of recordings for which ownership information is not readily available and the "confusion caused by cold information trails leading to long dead owners and record companies that have gone out of business[?]"  *See* U.S. Copyright Office, *Federal Copyright Protection for Pre-1972 Sound Recordings* 76 n.303 (citation omitted), Soto Decl. Ex. 27.  Would the common law right be subject to the long list of exemptions to the federal public performance right?  *See, e.g.*, 17 U.S.C. § 110(1) (exemption for classroom performance or display); *id.* § 110(3) (exemption for performance or display in the course of religious services or worship); *id.* § 110(5)(B) (exemption for some performances by small businesses).

17

contemplated when enacting the statutory licenses." Comments of SoundExchange, Inc. at 12, *Music Licensing Study: Notice and Request for Public Comment*, Docket No. 2014-03 (May 23, 2014), Soto Decl. Ex. 29.

This array of policy counter-arguments underscores the inappropriateness of Plaintiff's effort to upend decades of settled practice and extract punitive retroactive penalties through litigation rather than having such a consequential matter considered through legislation, where all interested stakeholders (many of which are not parties to this action) could be heard, where a full complement of policy judgments could be made.[11]

### D.   State Regulation Of Performances By A Nationwide Broadcaster Like Sirius XM Would Violate The Commerce Clause

Even if Florida wanted to regulate public performances of Pre-1972 Recordings, it could not do so with respect to nationwide broadcasters like Sirius XM. The Supreme Court has long held that the Commerce Clause precludes state regulation of "commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 335-36 (1989) (internal quotation omitted). This bar applies equally to enactments of a state legislature and to court pronouncements. *See Allergan, Inc. v. Athena Cosmetics, Inc.*, 738 F.3d 1350, 1359 (Fed. Cir. 2013) ("Neither the [state] courts nor the [state] legislature are permitted to regulate commerce entirely outside of the state's borders."). The Supreme Court has developed a categorical approach to state economic regulation like that proposed here: "When a state statute directly regulates . . . interstate commerce . . . [the Court has] generally struck down the statute without further inquiry." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986). If the regulation has such a "practical effect" on interstate commerce, "it violates the Commerce Clause per se." *NCAA v. Miller*, 10 F.3d 633, 638-39 (9th Cir. 1993); *see also Healy*, 491 U.S. at 336 ("The critical inquiry is whether the practical effect . . . is to control conduct beyond the boundaries of the State"). Applying these principles, courts repeatedly have struck down state regulations that, in practical effect, regulated conduct beyond the state's boundaries where, as here, the regulated activity necessarily was national in scope. *See. e.g.*, *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003); *Am. Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1161 (10th Cir. 1999);

---

[11] Federal legislative debate on this issue is currently ongoing. *See* Frear Decl. ¶ 15 & Exs. C-E.

*NCAA v. Roberts*, TCA 94-40413-WS, 1994 WL 750585, at *1 (N.D. Fla. Nov. 8, 1994).

Recognizing a Florida public performance right in Pre-1972 Recordings would, as to any broadcast activity that is national in scope, impermissibly regulate extraterritorial conduct in violation of the dormant Commerce Clause.  Sirius XM broadcasts identical programming to subscribers in Florida and every other state in the continental U.S.  *See* SXM 56.1 ¶¶ 6-7.  This is required both by law and technological necessity:  Sirius XM's FCC licenses prevent it from offering state-specific programming, and Sirius XM's delivery systems are not designed to direct (or restrict) the transmission of signals or programming to particular states or the location of the radio receiver unit.  *Id*.  Indeed, a large majority of Sirius XM's subscribers listen through radios installed in their vehicles or on mobile phones or laptop computers, which inevitably cross state lines.  The practical effect of Plaintiff's proposed state regulation would be that Sirius XM could not broadcast Pre-1972 Recordings on any of its channels to any of its subscribers anywhere in the United States, including in all of the other states that do not recognize any such performance right, without securing a license or otherwise complying with Florida regulation.  By effectively requiring Sirius XM to obtain a license or other consent to play Pre-1972 Recordings anywhere in the country, Florida would impermissibly "project its legislation into other States by regulating the price to be paid" for public performances of those recordings in other states.  This is a per se violation of the Commerce Clause.  *See Brown-Forman*, 476 U.S. at 582 ("Forcing a merchant to seek regulatory approval in one State before undertaking a transaction in another directly regulates interstate commerce.").

Neither 17 U.S.C. § 301(c) nor *Goldstein*, 412 U.S. 546, is to the contrary.  The savings clause of Section 301(c) just leaves states free to regulate *intra*-state commerce (*e.g.*, piratical sales in the state); it does not grant new powers to states to regulate interstate commerce.[12]  *See, e.g.*, *Wyoming v. Oklahoma*, 502 U.S. 437, 457-58 (1992).  *Goldstein*—a case addressing a state law record piracy statute—was premised on the assumption that geographic limitations inherent in state prohibitions on *copying and piracy* naturally prevented one state's laws from

---

[12] The legislative history is clear: the Justice Department proposed 301(c) (then identified as 301(b)) specifically to preserve state record piracy laws for Pre-72 Recordings.  *See Copyright Law Revision: Hearings Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the H. Comm. on the Judiciary on H.R. 2223*, at 1396-98 (Comm. Print 1975) (statement of RIAA President in support of the amendment so as to preserve state "antipiracy statutes"), Soto Decl. Ex. 30.

impermissibly intruding into other states: "If one State grants such protection, the interests of States which do not are not prejudiced since their citizens remain free to copy within their borders those works which may be protected elsewhere."  412 U.S. at 558.  Adopting a Florida performance right in Pre-1972 Recordings, however, would do just what *Goldstein* suggested would be impermissible:  require a broadcaster to pay a "tariff" in one state before it could broadcast Pre-72 Recordings anywhere in the nation or to forego broadcasting those recordings everywhere if unable to obtain such a license in Florida.  *Id.* at 559.

## II.      PLAINTIFF'S "SECONDARY" CLAIMS BASED ON UNAUTHORIZED REPRODUCTION AND DISTRIBUTION FAIL BECAUSE SIRIUS XM HAS NEITHER MADE NOR DISTRIBUTED COPIES OF PLAINTIFF'S RECORDINGS IN FLORIDA

While its claims based on Sirius XM's broadcasts are the "gravamen of the Complaint," Plaintiff has asserted "secondary" claims under Florida law based on purported distribution and copying of its recordings.  Pl. Trans. Op. at 11; *see* Am. Compl. ¶ 9.  These tag-along claims are equally meritless.  To the extent Plaintiff's claims are based on copying or distribution, they fail for lack of proof.  Sirius XM has not distributed or otherwise allowed its subscribers to save and access copies of Plaintiff's recordings.  SXM 56.1 ¶ 22.  Moreover, while Sirius XM does make certain reproductions of recordings in aid of its broadcast activities, Sirius XM has not made any copies of Plaintiff's recordings in Florida.  SXM 56.1 ¶ 11.  Plaintiff's claims in this action are limited to those asserted under Florida law, and Florida law does not govern copies made in other states.  As the U.S. Supreme Court made clear in *Goldstein*, "a copyright granted by a particular State has effect only within its boundaries," and citizens of *other* states "remain free to copy within their borders those works which may be protected elsewhere."  412 U.S. at 558.[13]

## CONCLUSION

For the foregoing reasons, Sirius XM is entitled to summary judgment, and the Complaint should be dismissed with prejudice.

---

[13] In any event, server and other "ephemeral" copies made prior to January 1, 2012 are insulated from attack here because Plaintiff is bound by a class-wide settlement agreement from a previous class action concerning Sirius XM devices not at issue here.  *See* SXM 56.1 ¶¶ 50-51; Final Order and Judgment, *In re XM Satellite Radio Copyright Litigation*, No. 06 CV 3733 (LAK) (S.D.N.Y. Mar. 22, 2011), Dkt. No. 123; Final Order and Judgment, *Nota Music Publishing, Inc. v. Sirius Satellite Radio Inc.*, No. 07 CV 6307 (AKH) (S.D.N.Y. Jan. 9, 2012), Dkt. No. 57.

Dated: July 15, 2014                    Respectfully submitted,


                                        */s/ Edward Soto*
                                        Edward Soto (Fla. Bar No. 0265144)
                                        edward.soto@weil.com
                                        Weil, Gotshal & Manges LLP
                                        1395 Brickell Ave, Suite 1200
                                        Miami, FL 33131
                                        (305) 577-3100

                                        R. Bruce Rich (admitted *pro hac vice*)
                                        Benjamin E. Marks (admitted *pro hac vice*)
                                        Todd Larson (admitted *pro hac vice*)
                                        John R. Gerba (admitted *pro hac vice*)
                                        Weil, Gotshal & Manges LLP
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Tel:    212-310-8000

                                        Michael S. Oberman (*pro hac vice* pending)
                                        Kramer Levin Naftalis & Frankel LLP
                                        1177 Avenue of the Americas
                                        New York, New York 10036
                                        Tel:    212-715-9294

                                        *Attorneys for Defendant Sirius XM Radio Inc.*

21

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Southern District of Florida by using the CM/ECF system, which sent notification of such filing to all CM/ECF participants.  All other counsel shall be served by United States mail.

**Plaintiff Flo & Eddie, Inc.'s Counsel:**

Glen H. Waldman
Eleanor T. Barnett
Jason Gordon
Heller Waldman, P.L.
3250 Mary Street, Suite 102
Coconut Grove, Florida 33133

Henry Gradstein
Maryann R. Marzano
Harvey Geller
Gradstein & Marzano, P.C.
6310 San Vincente Blvd., Suite 510
Los Angeles, California 90048

*/s/ Edward Soto*
Edward Soto (Fla. Bar No. 0265144)
edward.soto@weil.com
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Ave, Suite 1200
Miami, FL 33131
(305) 577-3100

*Attorneys for Defendant Sirius XM Radio Inc.*