IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE 1:13-CV-23182-GAYLES/TURNOFF

FLO & EDDIE, INC., individually and on behalf of
all others similarly situated,

                         Plaintiff,

      -against-

SIRIUS XM RADIO INC., and DOES 1 through 10,

                         Defendants.
_____

## SIRIUS XM'S SUPPLEMENTAL MEMORANDUM IN FURTHER SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON LIABILITY

### I. INTRODUCTION

Sirius XM submits this supplemental memorandum to bring the Court's attention to a key authority and recent ruling that were not addressed in the prior summary judgment briefing.

*First*, *RCA Mfg. Co. v. Whiteman*, 114 F.2d 86, 88 (2d Cir. 1940), considered the same question at issue in Sirius XM's Motion for Summary Judgment: "whether [the record company] had any musical property at common-law in the records which radio broadcasting invaded." Judge Learned Hand, after reviewing the common law and the Supreme Court's decision in *International News Service* (which plaintiff relies on in its Opposition), concluded that the record company had *no* such performance right in its sound recordings and could *not* assert a claim for unfair competition based on their broadcast. Because Florida law, consistent with *Whiteman*, has never recognized any ownership right in the performance of pre-1972 sound recordings, the Court should grant Sirius XM's Motion for Summary Judgment.

*Second*, in the *Flo & Eddie* case currently pending in the Southern District of New York, Judge McMahon recently recognized that "it is reasonable to interpret § 301(c) [of the Copyright Act] as a [savings clause], and not as an authorization for states to interfere with interstate commerce." Ex. C at 37. This supports Sirius XM's argument that applying a common law performance right in pre-1972 sound recordings to Sirius XM's national broadcasts would violate the Commerce Clause.

## II. OWNERS OF SOUND RECORDINGS HAVE NEVER HAD A COMMON LAW PERFORMANCE RIGHT.

The common law rule that no performance right exists in sound recordings was established in *Whiteman*. *Whiteman* presented facts similar to those here. A record company and orchestra leader brought common law copyright and unfair competition claims against a radio network for nationally broadcasting records that had been sold to the public. Judge Learned Hand held that no common law right existed that would grant the owners of the sound recordings the right to control their public broadcast.[1]  114 F.2d at 89-90. No performance right existed because common law copyright "consists only in the power to prevent others from reproducing the copyrighted work." *Id.* at 88. The radio network "never invaded any such right of Whiteman; they have never copied his performances at all; they have merely used those copies which he and the RCA Manufacturing Company, Inc. made and distributed." *Id.*

*Whiteman* remains the definitive case on performance rights in sound recordings. After *Whiteman*, a consensus formed that there was no performance right in a sound recording under state common law. *See* Robert L. Bard & Lewis S. Kurlantzick, *A Public Performance Right in*

---

[1] Judge Hand surveyed the common law and found that only one case—*Waring v. WDAS Broad. Station, Inc.*, 327 Pa. 433 (1937)—had recognized a performance right in a sound recording (in the limited form of protecting records sold with a label barring their broadcast). Judge Hand declined to follow that case, and established what has become the longstanding rule that there is no performance right in sound recordings.

*Recordings*, 43 GEO. WASH. L. REV. 152, 154-56, 171 (1974) ("The last reported case involving purported common law performing rights was *R.C.A. Mfg. Co. v. Whiteman*…. Furthermore, record companies have not tried to establish a public performance right through state legislation as they successfully did with respect to unauthorized record duplication."); Sidney A. Diamond, *Sound Recordings and Phonorecords: History and Current Law*, 1979 U. ILL. L.F. 337, 346-47, 358 (1979) ("*Whiteman* stands for the principle that the sale of a record divests the production company or the performing artists of their rights, if any, to control its use."); Douglas G. Baird, *Common Law Intellectual Property and the Legacy of International News Service v. Associated Press*, 50 U. CHI. L. REV. 411, 419 n.35 (1983) (noting that the "law did not (and in fact still does not) give a performer the right to control radio broadcasts of his performances"); Register of Copyrights, *Federal Copyright Protection for Pre-1972 Sound Recordings: A Report of the Register of Copyrights*, at 44-45 (U.S. Copyright Office Dec. 2011) (report to Congress) (citing *Whiteman* and explaining that "state law does not appear to recognize a performance right in sound recordings"); June M. Besek & Eva E. Subotnik, *Constitutional Obstacles? Reconsidering Copyright Protection for Pre-1972 Sound Recordings*, 37 COLUM. J. L. & ARTS 327, 338 (2014) ("states do not appear to recognize a right of public performance in pre-1972 sound recordings").

In the *Flo & Eddie* case pending in the Central District of California, plaintiff cited two non-binding orders from New York courts to undermine *Whiteman*. But neither order discusses *Whiteman* or addresses the existence of a performance right in sound recordings. In *Capitol Records, LLC v. Harrison Greenwich, LLC*, No. 65224 (N.Y. Sup. Ct. May 13, 2014), the court merely granted an unopposed request for a factual finding that defendant engaged in an

"unauthorized performance" of a 1970 song.[2]  In the *Flo & Eddie* New York case, Judge McMahon declined to consider that order because it "does not explain its ruling and cites no prior case law recognizing any public performance right in sound recordings."  Ex. C at 20 n.2.  In *Capitol Records, LLC v. Escape Media Group, Inc.*, Case No. 12-cv-06646, Dkt. 90 (S.D.N.Y. May 28, 2014), which involves the digital uploading and streaming of pre- and post-1972 sound recordings, the magistrate accepted plaintiff's unopposed argument (without analysis) that if defendant infringed plaintiff's performance rights under federal law, then it also infringed plaintiff's rights under state law.

Two courts applying New York law have declined to follow *Whiteman* on the question— *not* at issue here—of whether there is a right to control *copying* after the sale of a sound recording.  *See Capitol Records, Inc. v. Mercury Records Corp.*, 221 F.2d 657, 661-62 (2d Cir. 1955);[3] *Capitol Records, Inc. v. Naxos of Am., Inc.*, 830 N.E.2d 250, 259-60 (N.Y. 2005).  Judge Hand stated that after a record's sale to the public, "anyone may copy it…." *Whiteman*, 114 F.2d at 89.  Albeit dictum (because *Whiteman* did not involve the issue of copying), this portion of Judge Hand's opinion has not been followed and courts have protected sound recordings from unauthorized duplication and distribution after their sale to the public—*i.e.*, bootlegging.  On the core issue of whether a *performance* right exists in a sound recording, *Whiteman* remains on point.  As commentators have noted over the last 75 years, including the Register of Copyrights,

---

[2] There was no dispute that the defendant restaurant *copied* Capitol's song by uploading it to the restaurant's website without permission.  *Harrison*, 44 Misc. 3d 202, 205.  The court held this uploading infringed Capitol's exclusive right to reproduce the sound recording.  *Id.*

[3] In *Mercury Records*, the court assumed that *Metro. Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 199 Misc. 786, 796 (N.Y. Sup. Ct. 1950), had impliedly overruled *Whiteman*.  *Metro. Opera*, however, does not even mention *Whiteman*.  Like *Mercury Records* and *Naxos*, *Metro. Opera* addressed the unauthorized *copying* and *distribution* of sound recordings.  *Metro. Opera* did not address—much less decide—the issue of whether a *performance* right exists in a sound recording. That question had already been settled by *Whiteman*.

*Whiteman* established that owners do *not* have the right to restrict the public performance of their sound recordings. *See* Register of Copyrights Report at 44-45.

This limited right for sound recordings—namely, a right to control reproduction—was confirmed in Florida in 1985, when a court permitted the owner of sound recordings, under a common law theory of unfair competition and conversion, to prevent the unauthorized *copying* of those recordings by bootleggers. *See CBS, Inc. v. Garrod*, 622 F. Supp. 532 (M.D. Fla. 1985). This is consistent with the limited rights in sound recordings that *Whiteman* recognized. *See* 114 F.2d at 88. Like the rest of the United States, the ownership right in sound recordings in Florida was and remains limited to copying and distribution.[4]

Sound recording owners like plaintiff have understood this, particularly with respect to radio broadcasts, where widespread exposure drives consumers to purchase plaintiff's records. In 1967, the president of Capitol Records testified before Congress in support of adding a performance right to control and receive compensation for the airing of sound recordings on the radio, and acknowledged that there was no such right under existing law:

> The record manufacturer makes his profit, if any, solely from the sale of records…. The record company receives nothing from the widespread performance-for-profit of its products, whether on radio or television, in clubs, or restaurants…. Our aim [in selling records] is to take advantage of the immediate demand caused by initial radio exposure…. [If a radio station plays a record before the record company has delivered enough copies to stores] that creates a demand which Capitol Records is unprepared to fill…. There is no clearly established legal remedy to stop this unauthorized use of our product.

*See* Copyright Law Revision: Hearing Before the Subcomm. of Patents, Trademarks & Copyrights of the Sen. Comm. on the Judiciary, 90th Cong., 494, 496, 501-02 (1967) (testimony

---

[4] In the *Flo & Eddie* New York case, Judge McMahon erroneously concluded that a public performance right exists in pre-1972 sound recordings under New York common law. Ex. C at 25. Judge McMahon—like Judge Gutierrez in the *Flo & Eddie* California case—did not have the benefit of any briefing on *Whiteman*. As a result, Judge McMahon incorrectly believed there had been a "century of judicial silence" on the question, *id*. at 18, when in fact *Whiteman* had already addressed it and refused to recognize a performance right in sound recordings.

5

of Alan Livingston, president of Capitol Records) ("1967 Hrg."). The case law cannot be read to support plaintiff's argument that the common law afforded a public performance right in sound recordings. If this were true, there is no explanation for why the recording industry would have admitted in its testimony to Congress that no performance right exists. The owners of sound recordings never asserted a performance right under state common law in the decades that followed *Whiteman* for the simple reason that no such right exists.

### III. ALLOWING A STATE PERFORMANCE RIGHT IN PRE-1972 RECORDINGS TO SIRIUS XM'S NATIONAL BROADCASTS WOULD VIOLATE THE COMMERCE CLAUSE.

As set forth in Sirius XM's Motion for Summary Judgment, applying a performance right in pre-1972 sound recordings under Florida law to Sirius XM's national broadcasts would violate the Commerce Clause. Dkt. 77 at 18-20. Plaintiff's Opposition asserted that Congress had expressly *authorized* state action in this area via Section 301(c) of the Copyright Act. Dkt. 94 at 17-19. Judge McMahon recently reached the opposite conclusion on this point in the *Flo & Eddie* New York case, holding that "it is reasonable to interpret § 301(c) as a [savings clause], and not as an authorization for states to interfere with interstate commerce." Ex. C at 37.

Judge McMahon relied on *New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982), in which the Supreme Court held that a savings clause is not an "authorization" to exempt state regulation from Commerce Clause scrutiny. *New England Power* concerned the Federal Power Act, which provided that the Act "shall not … deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line." *Id*. at 341. The Supreme Court held that this language was a savings clause that saves state regulations from preemption. It further held that savings

6

clauses are "in no sense an affirmative grant of power to the states to burden interstate commerce in a manner which would otherwise not be permissible." *Id.*

Judge McMahon recognized that, "[l]ike the statute at issue in *New England Power*, § 301(c) is framed as a limitation on preemption, not a relaxation of Commerce Clause limitations." Ex. C at 37. Indeed, she found that interpreting Section 301(c) as a savings clause is "even more persuasive here because, unlike in the statute analyzed in *New England Power*, § 301(c) makes no explicit reference to any sort of interstate commerce." *Id.* Because Section 301(c) is not an authorization for states to burden interstate commerce, plaintiff must defend its attack on the Commerce Clause on the merits. For the reasons set forth in Sirius XM's summary judgment briefing, it cannot do so. Dkt. 77 at 18-20; Dkt. 101 at 9-10.

Judge McMahon rejected Sirius XM's Commerce Clause argument on the ground that "a state's general property law and associated liability principles" could not violate the Commerce Clause because this does not "amount to a 'regulation' of interstate commerce." Ex. C at 39. This ruling was based on the erroneous assumption that a law of general applicability is immune from Commerce Clause scrutiny. That is not correct. The Supreme Court has made clear that a "state law that has the '*practical effect*' of regulating [interstate] commerce … is invalid," *Healy v. Beer Inst.*, 491 U.S. 324, 332 (1989) (emphasis added), even if it does not directly regulate interstate commerce. *See Flood v. Kuhn*, 407 U.S. 258, 284-85 (1972) (violation of Commerce Clause to apply state antitrust statute to National League of Professional Baseball, which would affect its nationally uniform system); *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 104 (2d Cir. 2003) (Vermont statute prohibiting distribution of pornographic material to minors violated Commerce Clause *per se* when applied to plaintiffs' internet speech, which has no "geographic boundaries").

Judge McMahon also erroneously relied on *Sherlock v. Alling*, 93 U.S. 99 (1876), and its progeny, which held that a party that engages in interstate commerce cannot use its status as a shield to avoid liability for conduct that occurs within a state. Those cases are inapposite. Unlike *Sherlock*, recognizing a state-specific performance right for sound recordings would not "indirectly and remotely affect[s] the operations of commerce." 93 U.S. at 104. Because its FCC license prohibits state-specific broadcasting, Sirius XM could not engage in interstate commerce *at all* without complying with this law. This is tantamount to imposing a state-specific "license fee" on interstate commerce, which *Sherlock* recognizes would be improper. *Id.* at 102.

Moreover, Judge McMahon did not address the "as applied" test, which affords an independent basis for finding a Commerce Clause violation. When a state law "regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church*, 397 U.S. 137, 142 (1970). Recognizing a performance right in pre-1972 sound recordings under Florida law would fail this test, as applied to Sirius XM's national broadcast of plaintiff's recordings, because: (1) the conduct has only a limited connection to Florida; (2) its effects on interstate commerce are not "incidental"; and (3) any Florida-specific interest is outweighed by the burden on interstate commerce.

As to the first element, the statute that Arizona sought to defend in *Pike* required fruit grown in the state to be packaged in the state and in a way that protected the interests of Arizona growers. *Id.* at 142-43. That constituted a legitimate local interest. *Id.* In contrast, plaintiff's claims are not specific to Florida, as evident from plaintiff's litigation tactics. Plaintiff is

simultaneously suing Sirius XM in three separate states and has not shown that any one of the states has a unique interest in extending performance rights to owners of pre-1972 sound recordings.[5]  This is a dispute in which plaintiff—a corporation—seeks to control the *national* broadcast of its sound recordings by a *New York* business.

Even if some local benefit would accrue to Florida, under the second and third elements, the burden on interstate commerce of recognizing a performance right is not "incidental" and far outweighs any interest Florida could have.  *Cf. id.*  The burden on interstate commerce that a Florida performance right would impose is staggering.  As Judge McMahon observed in the *Flo & Eddie* New York case, recognizing a state-specific performance right for sound recordings would have "significant economic consequences" and "could upend the analog and digital broadcasting industries."  Ex. C at 40.  At a minimum, broadcasters from states transmitting pre-1972 recordings into Florida could be forced to pay for licenses to rights holders nationwide.  This could shut down many broadcasters, or force them to remove all pre-1972 songs from their playlists, thereby depriving listeners nationwide of access to these recordings.  Plaintiff has done nothing to assure the Court applying a performance right in pre-1972 sound recordings under Florida law would not burden the commerce of other states.  For that reason, as applied, recognizing such a right would violate the Commerce Clause.

---

[5] In fact, recognizing such a performance rights would likely *harm* composers residing in Florida (and elsewhere), because their songs would receive less exposure, reducing their existing royalties and other licensing opportunities.  That may explain why, when the president of Capitol Records testified before Congress in 1967, he said that songwriters opposed the recognition of a performance right for sound recordings.  *See* 1967 Hrg. at 502-03.

## IV. CONCLUSION

For the reasons stated herein, the Court should find that no performance right exists in pre-1972 sound recordings and grant Sirius XM's Motion for Summary Judgment.

Dated: November 21, 2014

Respectfully submitted,

*/s/ David M. Gersten*
David M. Gersten
dgersten@bilzin.com
Bilzin Sumberg LLP
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131-3456
Tel: (305) 350-7230
Fax: (305) 351-2211

Daniel M. Petrocelli (Admitted *pro hac vice*)
dpetrocelli@omm.com
Robert M. Schwartz (Admitted *pro hac vice*)
rschwartz@omm.com
Victor H. Jih (Admitted *pro hac vice*)
vjih@omm.com
O'Melveny & Myers LLP
1999 Avenue of the Stars
Los Angeles, California 90067-6035
Tel: (310) 553-6700
Fax: (310) 246-6779

*Attorneys for Defendant Sirius XM Radio Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of November, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system on all counsel of record authorized to receive Notices of Electronic Filing generated by CM/ECF.

*/s/ David M. Gersten*
David Gersten

MIAMI 4424026.1 81424/45484